United States District Court
Southern District of Texas
**ENTERED**
February 16, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| RICARDO SAUCEDA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:17-CV-135 |
| | § | |
| CITY OF SAN BENITO, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER AND OPINION</u>

In 2015, San Benito Police Officer Hector Lopez arrested Plaintiff Ricardo Sauceda in the driveway of his home.  In making the arrest, Lopez entered Sauceda's driveway by opening the gate to the chain-link fence that surrounded the property.  Upon entering the driveway, Lopez took a few steps and reached for Sauceda, who resisted.  A physical altercation ensued that ended in Sauceda's arrest, and during which Sauceda claims Lopez's actions injured him.  Two years later, Sauceda sued Lopez under 42 U.S.C. § 1983 for false arrest and the use of excessive force.

In 2019, the Court granted summary judgment in Lopez's favor, concluding that Lopez had not violated Sauceda's constitutional rights. (*See* Order, Doc. 68)  On direct appeal, the Fifth Circuit affirmed the granting of summary judgment as to Sauceda's excessive force claim, but reversed as to the cause of action for false arrest.[1] *See Sauceda v. City of San Benito, Texas*, 78 F.4th 174, 189–91 (5th Cir. 2023).  The Fifth Circuit concluded that Lopez had violated Sauceda's constitutional rights, but remanded the matter for this Court to consider whether "[q]ualified immunity may nonetheless protect Lopez's conduct" if the summary judgment record

---

[1] Sauceda also sued the City of San Benito.  The Court granted summary judgment as to all claims against the City, and the Fifth Circuit affirmed.  As a result, no causes of action remain pending against the municipality, and the Court will not address those claims in this Order and Opinion.

1 / 15

demonstrates that "'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officer[ ] possessed.'" *Id.* at 188.

Based on the summary judgment record, which now includes supplemental briefing by Sauceda and Lopez, the Court concludes that Lopez did not violate clearly established law by entering the curtilage of Sauceda's home to arrest him.  As a result, Lopez is entitled to the protections of qualified immunity.

## I.     Summary Judgment Facts[2]

In June 2015, Marco Cortez called the San Benito Police Department to report a complaint. Police Officer Hector Lopez, who was on patrol by himself, responded to the dispatch call and arrived at the location about five minutes later.

When Lopez arrived, Cortez explained that he was at his grandfather's home, attending a graduation party for one of his sisters.  He had been outside awaiting his wife when he saw Sauceda on his front lawn across the street.  Both men stood in view of each other.  After a short while, Sauceda allegedly asked Cortez, "What are you looking at?", and made offensive gestures, such as grabbing his crotch. (Cortez Dep., Doc. 42-2, 33:10–16)  Cortez told Lopez that he felt offended by Sauceda's words and conduct, and that he was concerned because children were present, so he had called the police.  He conveyed to Lopez that he "wanted to file a report of Mr. Sauceda's behavior and his actions." (Lopez Dep., Doc. 55-2, 52:4–5)

After this conversation, Lopez crossed the street to speak with Sauceda, who remained outside in his front yard.  Sauceda's property included a concrete driveway on the left.  A chain-link fence enclosed the front yard, including over the driveway, and rested about a car length from

---

[2] Except as otherwise indicated, the Court bases this section, on the submitted deposition testimony of Marco Cortez and Hector Lopez. (*See* Cortez Dep., Doc. 42–2; Lopez Dep., Doc. 55–2)  The Court views the competent summary judgment evidence in the light most favorable to Sauceda.

the street.  On the driveway, the fence possessed a wide gate for vehicles, as well as a smaller entry for individuals.  These two gates appear to be the only front entries onto Sauceda's property.

When Lopez approached Sauceda, they both stood on opposite sides of the fence near the smaller entry, which at the time was closed.  Lopez's body camera recorded his interaction with Sauceda, although no audio exists for the initial 30 seconds. (Lopez Bodycam, Ex. C, Doc. 39) When the audio begins, Sauceda is explaining a history of animosity between him and the neighbor whose home Cortez was visiting.  The two individuals had the following exchange:

| | |
|---|---|
| Lopez: | I need your driver license, sir. |
| Sauceda: | What do you need my driver license for? |
| Lopez: | Because I need to get your information. |
| Sauceda: | No, no I'm not putting in a report. |
| Lopez: | Huh? |
| Sauceda: | I'm not putting in a report. |
| Lopez: | I'm making a report. |
| Sauceda: | For what?  What's the problem? |
| Lopez: | I'm making a report. |
| Sauceda: | What's the problem? |
| Lopez: | Here's the thing, brother. |
| Sauceda: | You got a camera.  You think I'm doing something.  I'm not doing anything bad.  I'm minding my own business.  *Ya te dije lo que paso.* You don't understand, then. |
| Lopez: | No, this is the thing, I need your information right now. |
| Sauceda: | I'm not giving you anything.  (*He turned and began to walk toward his home, taking several steps.*) |

3 / 15

| Lopez:   | Yes, you are, brother. |
|----------|------------------------|
| Sauceda: | No, sir. |
| Lopez:   | (*He began to open the gate.*) |
| Sauceda: | (*He turned around and began walking back to the gate, arriving at the gate as he spoke.*) [Unclear] my dog.  Hey, you're not getting into my house without a search warrant. |
| Lopez:   | No, I'm going after you, brother. |
| Sauceda: | Turn on your camera. |
| Lopez:   | I have my camera. |

(*Id.* at 0:00:55–0:01:55)  During this exchange, the two men stood only a few apart; Sauceda at times resting his hand on the fence.

When Lopez opened the gate, he took one or two steps forward and reached toward Sauceda, who began to walk backward as he pushed or slapped away Lopez's hands.  The two men took four or five additional steps, until Lopez took hold of either Sauceda's arm, hand, or lapel (the video is unclear), and appears to have pulled Sauceda toward him.  Sauceda fell to his knees, and a struggle ensued.  Lopez ultimately subdued Sauceda and handcuffed him.

## II.    Procedural History

In May 2017, Sauceda filed his lawsuit against the City of San Benito in a Texas state court, alleging negligence under the Texas Tort Claims Act.  A month later, he amended his Petition to add Lopez as a defendant, alleging Section 1983 claims for false arrest and excessive force.  The City then removed the matter to this Court.

### A. First Ruling on Motion for Summary Judgment

In June 2019, Lopez filed his motion for summary judgment, arguing that he did not falsely arrest Sauceda or use excessive force, and that he was entitled to qualified immunity.

(Motion, Doc. 42)  As to the first claim, Lopez contended that probable cause existed to arrest Sauceda for disorderly conduct, providing false information, resisting arrest, evading arrest, and assault on a public servant.

The Court granted summary judgment, finding that Lopez did not violate Sauceda's constitutional rights when arresting him without a warrant, because Sauceda's resistance created probable cause for the arrest. (Order, Doc. 68, 6–8)  The Court found that Lopez had the authority to open Sauceda's fence gate based on the principle that "police officers may enter upon private property to make warrantless arrests, provided the arrest is based on probable cause and the person is in plain view". *United States v. Varkonyi*, 645 F.2d 453, 457 (5th Cir. 1981).  Based on this ruling, the Court had no need to consider whether any violation of Sauceda's constitutional rights had been clearly established.

### B. Sauceda's Appeal

In August 2023, the Fifth Circuit reversed this Court's conclusion as to Sauceda's claim for false arrest. *See Sauceda*, 78 F.4th at 174.  On appeal, Lopez defended his position that various grounds had created probable cause to arrest Sauceda.  The Fifth Circuit reasoned, however, that "even if probable cause existed to arrest Sauceda for disorderly conduct, Lopez lacked authority to enter the curtilage of Sauceda's home to arrest him for this purpose." *Id*. at 185.  The court cited to a "factually similar" decision in which it had "held that an apartment's backyard, which was inaccessible to others and 'completely removed from the street and surrounded by a chain link fence,' was 'sufficiently removed and private in character' to constitute part of the curtilage." *Id*. at 184 (quoting *Fixel v. Wainwright*, 492 F.2d 480, 484 (5th Cir. 1974)).  At the very least, reasoned the court, a fact issue existed "as to [Sauceda's] curtilage status." *Id*. at 185.

Having concluded that Lopez improperly entered the curtilage of Lopez's home without a warrant, the Fifth Circuit then considered "whether an exception to the warrant requirement

applies." *Id.* Lopez relied on the hot pursuit exception, under which an officer may enter a private residence and arrest a suspect to prevent the suspect from fleeing. For the exception to apply, however, the suspect must be moving from a "public place" into a "private place." In contending that Sauceda had attempted to move from a public place into his home, Lopez relied on *Varkonyi*, which indicated that "police officers may enter upon private property to make warrantless arrests, provided the arrest is based on probable cause and the person is in plain view". 645 F.2d at 457.

The Fifth Circuit rejected this position, warning against construing the "plain view" language in *Varkonyi* "too literally". *Sauceda*, 78 F.4th at 185. This phrase would not permit, explained the court, an officer to enter a home to conduct a warrantless arrest of a suspect who was standing by "an open window or on an upper balcony." *Id.* In the same way, an officer could not conduct a warrantless arrest of "a suspect [who] stands within the curtilage of their house from behind a closed gate, albeit visible to the public." *Id.* Rather, courts should construe the "plain view" language as synonymous with "a public place"–i.e., areas "where there is no expectation of privacy." *Id.*

Based on this analysis, the Fifth Circuit concluded that when Lopez confronted Sauceda, the latter had stood in a private place–i.e., within the curtilage of his home, demarcated by the fence that encompassed his property. As a result, the hot pursuit exception proved inapplicable; Sauceda had not moved from a public place into a private place, but had simply moved from one section to another section of his private property. And no other exception applied, meaning that Lopez could not enter Sauceda's property to conduct a warrantless arrest.

The Fifth Circuit also considered each of the grounds that Lopez claimed created probable cause to arrest Sauceda. On this issue, the Fifth Circuit agreed that "Lopez had the requisite probable cause to arrest Sauceda *once Sauceda began resisting*." *Id.* at 187 (emphasis in original). That moment arguably occurred, however, after Lopez had already arrested Sauceda. In other

words, "a reasonable factfinder could still find that Lopez made an unlawful arrest *before* Sauceda's resistance." *Id.* at 187 (emphasis in original).

Given that the Fifth Circuit concluded that Lopez lacked the authority to enter Sauceda's property to conduct a warrantless search, the Fifth Circuit found that the "the district court's provision of qualified immunity to Lopez" on the basis that he acted lawfully "must be reversed." *Id.* at 188.  It remanded the case, however, for the district court to consider whether qualified immunity nevertheless protected Lopez because his conduct had been "objectively reasonable in these circumstances." *Id.* at 188–89.

### C. On Remand

In October 2023, the Court held a Status Conference and then ordered the parties to submit supplemental briefing as to: "(1) whether the Fifth Circuit's decision limited Sauceda's cause of action for false arrest; and (2) whether Lopez is entitled to qualified immunity". (Order, Doc. 78)

In Lopez's supplemental brief, he argues that the Fifth Circuit narrowed the scope of Sauceda's false arrest claim to the brief period between Lopez's entry onto Sauceda's driveway and Sauceda beginning to resist arrest. (Lopez Supp. Brief, Doc. 80, 13–15)  He also continues to claim qualified immunity, contending that on the day in question, the law did not clearly establish that Sauceda, on his driveway a few feet inside of his closed fence, stood within the curtilage of his home and, as a result, in a "private place" for purposes of the Fourth Amendment. (*Id.* at 16–25)

Sauceda contests that the Fifth Circuit limited his false arrest claim, and argues that the law of the case doctrine prohibits a relitigation of "whether the right at issue was clearly established at the time of the defendant's alleged conduct." (Sauceda Supp. Brief, Doc. 81, 6 and 8)

### III.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 229 (5th Cir. 2016).  "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment." *Offshore Drilling Co. v. Gulf Copper & Mfg. Corp.*, 604 F.3d 221, 227 (5th Cir. 2010).

"If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).  "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

"When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party."  *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578–79 (5th Cir. 2020). "We resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Spring St. Partners–IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013). Courts cannot "assume, however, in the absence of any proof, that the nonmoving party could or would prove the necessary facts." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009).

IV.     **Analysis**

    **A.  Scope of Remand**

The Court initially considers the issues that remain pending on remand.

First, the Fifth Circuit's decision renders clear that this Court must still determine whether Lopez receives the protections of qualified immunity.  After concluding that Lopez violated Sauceda's constitutional rights by entering the curtilage of his home to conduct the arrest, the Fifth Circuit expressly noted that Lopez could still receive the protections of qualified immunity "if 'a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officer[ ] possessed.'" *Sauceda*, 78 F.4th at 188 (quoting *Washington v. Salazar*, 747 F. App'x 211, 215 (5th Cir. 2018)).  The court "remand[ed] to the district court to determine whether Lopez's conduct was objectively reasonable in these circumstances." *Sauceda*, 78 F.4th at 188–189.  If this Court answers that question in the affirmative, then Lopez is entitled to summary judgment based on qualified immunity.  The nature of the remand undermines Sauceda's argument that the law-of-the-case doctrine precludes this Court from considering whether Lopez is entitled to the protections of qualified immunity.  "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 238 (5th Cir. 2012) (internal quotation marks omitted).  But the doctrine applies "only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not." *Id.* at 238-39.  In the present case, the Fifth Circuit expressly did not reach the clearly-established prong of the qualified-immunity analysis.

Second, the Fifth Circuit's decision also effectively limits Sauceda's causes of action to any constitutional violations that occurred between the time that Lopez opened Sauceda's fence gate and the moment that Sauceda began to resist Lopez.  The Fifth Circuit "agree[d] that Lopez had

the requisite probable cause to arrest Sauceda *once Sauceda began resisting*." *Sauceda*, 78 F.4th at 187 (emphasis in original).  On the other hand, the court also explained that Lopez "had no legal justification to enter Sauceda's property without a warrant", and that a jury could find that *before* Sauceda began resisting arrest, Lopez "had *already* . . . placed [him] under an unlawful arrest." *Id.* (emphasis in original).  The court recognized that the unlawful arrest became lawful "moments later by virtue of [Sauceda's] resistance", but that reality did not preclude Lopez from being "held liable for the unlawful part" of the incident.  *Id.* at 188.  In other words, Lopez violated Sauceda's constitutional rights by opening Sauceda's fence gate, taking a few steps toward Sauceda, and arresting him by placing a hand on his arm.  When Sauceda swatted away Lopez's grip, probable cause arose to arrest Sauceda for resisting arrest and, as a result, Lopez's conduct from that moment forward was lawful.  The unlawful portion of Lopez's conduct elapsed within a few seconds, but Sauceda could pursue his claims as to Lopez's conduct during that time period.  In a tacit recognition of the limited nature of such a claim, the Fifth Circuit noted that plaintiffs can recover nominal damages in a false arrest action, and may be entitled to attorney's fees based on such an award. *Id.* at 188, n. 9.

### B.  Qualified Immunity: Clearly Established Analysis

The two-part test for qualified immunity requires a court to determine: (1) whether the defendant's actions violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the defendant's actions. *Pearson v. Callahan*, 555 U.S. 223 (2009).  On remand, only the second part of the test remains at issue.

"For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ford v. Anderson Cnty., Texas*, 90 F.4th 736 (5th Cir. 2024) (cleaned up) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The plaintiff must point the court "to a legislative directive or case

precedent that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that law." *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020). Only published decisions that predate the underlying incident can create clearly established case law. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018); *Henderson v. Harris Cnty., Texas*, 51 F.4th 125, 133 (5th Cir. 2022). While this standard does not "require a case directly on point," it does require a showing that existing precedent has "placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). The Supreme Court has "repeatedly" warned lower courts "not to define clearly established law at a high level of generality." *Id.* On the contrary, "specificity is especially important", as it can be difficult for officers to quickly determine how legal doctrines apply to the situation at hand. *Id.* "To overcome qualified immunity, plaintiffs must cite a body of relevant case law in which an officer acting under similar circumstances was held to have violated a defendant's constitutional rights." *Jimerson v. Lewis*, — F.4th —, No. 22-10441, 2024 WL 640247, at *4 (5th Cir. Feb. 15, 2024) (cleaned up). The "central concern" in this analysis "is whether the official has fair warning that his conduct violates a constitutional right." *Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018).

Based on these principles, Sauceda must identify case precedent from the time of his arrest that made it sufficiently clear to Lopez that every reasonable officer would have understood that he could not open the fence gate to arrest Sauceda, who was standing within a few feet of the chain-link fence.

At the time of the incident, the law clearly established certain legal principles. The Fourth Amendment renders "searches and seizures inside a home without a warrant [ ] presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *see also United States v. United States District Court for the Eastern District of Michigan*, 407 U.S. 297, 313 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth

Amendment is directed."). "The Fourth Amendment's protection . . . extends further than just the walls of the physical structure of the home itself." *Fixel v. Wainwright*, 492 F.2d 480, 483 (5th Cir. 1974). Specifically, the "Fourth Amendment extends to protect the 'curtilage' of a home from unconstitutional searches." *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997). Based on these principles, police officers understand that absent the applicability of limited exceptions, they cannot enter the curtilage of a home to conduct a warrantless arrest.

The law also clearly establishes the test to determine what portion of an individual's property falls within the home's curtilage. "The extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). "[T]he central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.* (cleaned up). In *Dunn*, the Supreme Court articulated four relevant factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. These factors should be applied as "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration–whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

While *Dunn* clearly established the relevant factors to determine the extent of a home's curtilage, the application of those factors has proven less clear. In the present case, Sauceda relies heavily on *Fixel*, which the Fifth Circuit described as "factually similar". *Sauceda*, 78 F.4th at 184. In *Fixel*, a criminal defendant lived in an apartment building that included a backyard "completely removed from the street and surrounded by a chain link fence." 492 F.2d at 484. The backyard

was not normally used by tenants to gain access to the apartments, or by salespeople or others to approach tenants in their homes.  As part of an investigation, a police officer entered the backyard without a warrant and seized contraband that included controlled substances and that the Government used to convict the defendant.  In a habeas challenge, the Fifth Circuit concluded that it was "absolutely clear that [Officer] Knapp unlawfully encroached on a protected area when he actually entered the backyard". *Id.* at 483.  The backyard was "sufficiently removed and private in character that he could reasonably expect privacy", rendering the backyard within the curtilage of the defendant's home. *Id.*  As a result, the court granted the petition for habeas corpus and reversed the conviction.  In the present case, Sauceda analogizes *Fixel* to his home, emphasizing that he also utilized a fence to demarcate the areas of his property that he considered private.

In response, Lopez claims that other decisions support his belief that Sauceda was not within the curtilage of his home at the time of the arrest.  (*See* Lopez Supp. Brief, Doc. 80, 22–23 (citing, inter alia, *Varkonyi*, 645 F.2d at 457–58; *Santana*, 427 U.S. 38 (1976); and *Katz v. United States*, 389 U.S. 347, 351 (1967)).  *Varkonyi* involved law enforcement officers who entered a property through an open gate to approach several workers in plain view.  The Fifth Circuit explained that "any area where there is no expectation of privacy is considered a 'public place' under the Fourth Amendment." *Varkonyi*, 645 F.2d at 457.  As the workers "were clearly visible through the fence", and "the gate was open", the Fifth Circuit concluded that it was "obvious" that they were in a "public place." *Id.*  In *Santana*, the Supreme Court concluded that a suspect standing in an open front doorway of her home was in a "public place" because she was "as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." 427 U.S. at 42.

In a more recent decision based on the application of the *Dunn* factors, the Fifth Circuit found that when law enforcement officers passed through an open gate of a privacy fence that

surrounded an apartment building, they did not enter the curtilage of that property. *United States v. Thomas*, 120 F.3d 564 (5th Cir. 1997). The court agreed that sufficient evidence supported the district court's determination that the gate was "left hanging open" and that the resident "had not taken any steps to indicate that the gate was an entry to a place that permission had to be given to enter." *Id.* at 572. Under those circumstances, the officers "could reasonably believe that the gate provided the principal means of access to the apartment, through which they could approach the front door." *Id.*

In the appeal of the present matter, the Fifth Circuit addressed this constellation of cases, noting that "[i]n *Santana, Hester*, and *Varkonyi*, the places in question were either unenclosed or accessible through an open door or gate." *Sauceda*, 78 F.4th at 186. In contrast, wrote the court, "Sauceda's yard was fenced off *and* his gate was closed." *Id.* (emphasis in original). Based on the distinction between the open and closed gates, the court concluded that the present matter was "therefore much closer to *Fixel* than *Varkonyi*." *Id.*

The Fifth Circuit's application of these decisions is not a pending issue; it is the law of the case that Lopez violated Sauceda's constitutional rights by entering the closed gate to arrest him without a warrant. At the same time, the nature of the Fifth Circuit's analysis does bear relevance on whether at the time that Lopez arrested Sauceda, existing caselaw provided him with fair warning that his conduct violated Sauceda's rights. The Fifth Circuit recognized that *Santana*, *Hester*, and *Varkonyi* demonstrate that some enclosed areas, including properties with surrounding fences, represent "public places" for purposes of the Fourth Amendment. Those decisions predate *Dunn*, but the Fifth Circuit has applied *Dunn* and concluded that a fenced-in area, albeit with an open gate, was not part of the curtilage of the home. *See Thomas*, 120 F.3d at 571. In addition, the fourth *Dunn* factor weighs heavily in Lopez's favor–i.e., it is indisputable that where Sauceda stood on his driveway, he had taken no steps "to protect the area from

observation by people passing by."  Indeed, Sauceda and his front door neighbor stood in plain view of each other; Sauceda's alleged conduct in open view represented the alleged actions that led the citizen to call the police in the first place.  And during the exchange between Lopez and Sauceda, they stood only a few feet apart and visible to any passerby.  Based on the caselaw at the time of the arrest, Lopez could reasonably rely on Sauceda's standing in plain view of anyone passing by to conclude that Sauceda was not within a constitutionally protected area.  *See Santana*, 427 U.S. at 42; *Varkonyi*, 645 F.2d at 458.  It is true that Lopez bore the duty to also consider that Sauceda was behind a chain link fence with a closed gate, and that the closed gate represented an unambiguous indication of Lopez's intent to exclude outsiders.  But at the time, no decision clearly articulated that a fence with a closed gate–as opposed to the open gates in cases such as *Varkonyi* and *Santana*–would prove such a significant, if not dispositive fact to distinguish a public from a private place.  Sauceda has certainly failed to identify any such caselaw, and it is his burden to do so.

## V.    Conclusion

For the reasons stated above, it is:

**ORDERED** that the Motion for Summary Judgment filed by Defendant Hector Lopez (Doc. 42) is **GRANTED**; and

**ORDERED** that Plaintiff Ricardo Sauceda's cause of action against Defendant Hector Lopez for false arrest is **DISMISSED WITH PREJUDICE**.

The Court will separately issue a Final Judgment in accordance with this Order and Opinion.

Signed on February 16, 2024.

_Fernando Rodriguez, Jr._
Fernando Rodriguez, Jr.
United States District Judge